### S96G1546. SIKES v. THE STATE.
(485 SE2d 206)

SEARS, Justice.

The issue presented by this granted certiorari[1] concerns the proper interplay between the first and third sentences of OCGA § 17-7-131 (e) (5) (B). The need to clarify the interplay between these sentences arises when a defendant who has been found not guilty by reason of insanity and who has been ordered to undergo involuntary inpatient treatment successfully completes a conditional release program ordered by a trial court under the authority of OCGA § 17-7-131 (e) (5) (A). In this situation, it is unclear (1) whether the first sentence of § 17-7-131 (e) (5) (B) requires the trial court to discharge the defendant from both involuntary inpatient and outpatient treatment, or (2) whether the first sentence requires the trial court only to discharge the defendant from the existing order for involuntary inpatient treatment, with the third sentence of § 17-7-131 (e) (5) (B) authorizing the trial court to require the defendant to participate in involuntary outpatient treatment. We conclude that the first sentence of § 17-7-131 (e) (5) (B) only requires a trial court to discharge the defendant from the order requiring involuntary inpatient treatment, and that the third sentence of that same Code section authorizes the trial court to require involuntary outpatient treatment. Because the record does not disclose whether the trial court found that the appellant, Hershel Sikes, had successfully completed his conditional release program, we remand the case for proceedings consistent with this opinion.

1. OCGA § 17-7-131 (e) (5) provides, in relevant part, as follows:

> (5) (A) If a defendant appears to meet the criteria for outpatient involuntary treatment as defined in Part 3 of Article 3 of Chapter 3 of Title 37, which shall be the criteria for release on a trial basis in the community in preparation for a full release, the court may order a period of conditional release subject to certain conditions set by the court. The court is authorized to appoint an appropriate community service provider to work in conjunction with the Department of Human Resources to monitor the defendant's compliance

---

[1] *Sikes v. State*, 221 Ga. App. 595 (1) (472 SE2d 101) (1996).

with these conditions and to make regular reports to the court.

(B) If the defendant successfully completes all requirements during this period of conditional release, the court shall discharge the individual from commitment at the end of that period. Such individuals may be referred for community mental health, mental retardation, or substance abuse services as appropriate. The court may require the individual to participate in outpatient treatment or any other services or programs authorized by Chapter 3, 4, or 7 of Title 37.

(C) If the defendant does not successfully complete any or all requirements of the conditional release period, the court may:

(i) Revoke the period of conditional release and return the defendant to a state hospital for inpatient services; or

(ii) Impose additional or revise existing conditions on the defendant as appropriate and continue the period of conditional release.

In the present case, Sikes was found not guilty by reason of insanity for the crime of misdemeanor theft by shoplifting. The trial court then found that Sikes met the requirements for involuntary inpatient treatment,[2] and ordered Sikes to undergo such treatment. The court subsequently conditionally released Sikes under the provisions of § 17-7-131 (e) (5) (A). Sikes contends that he successfully completed all requirements of his conditional release plan, and that the "discharge . . . from commitment" language of the first sentence of § 17-7-131 (e) (5) (B) requires that he be released from any involuntary treatment plan, whether inpatient or outpatient. Contrary to Sikes' request, the trial court continued Sikes' involuntary outpatient treatment. The record, however, does not establish whether the trial court found that Sikes had successfully completed his conditional release program. Thus, we cannot determine whether the trial court continued Sikes' involuntary outpatient treatment under the authority of subsection (e) (5) (C) (ii), on the ground that Sikes had not successfully completed the program, or whether the trial court continued outpatient treatment based upon the third sentence of subsection (e) (5) (B), on the ground that that sentence authorized it to do so even if Sikes had successfully completed the conditional release program. The Court of Appeals concluded that the trial court's order was authorized by the third sentence of subsection (e)

---

[2] See OCGA §§ 17-7-131 (e) (1-4); 37-3-1 (9.1).

(5) (B).[3] Because the trial court's order does not reveal whether the trial court found that Sikes had successfully completed his conditional release plan, it is necessary to remand the case to the trial court for that finding. However, to guide the trial court in the exercise of its options once it makes its findings on remand, we undertake to interpret the meaning of the first and third sentences of § 17-7-131 (e) (5) (B).

2. In interpreting these two sentences, certain rules of statutory construction are relevant. First, courts should construe a statute to give "sensible and intelligent effect" to all of its provisions and should refrain, whenever possible, from construing the statute in a way that renders any part of it meaningless.[4] Second, a court's duty is "to reconcile, if possible, any potential conflicts between different sections of the same statute, so as to make them consistent and harmonious."[5] Third, in construing language in any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole.[6] Fourth, in attempting to ascertain legislative intent of a doubtful statute, a court may look to the caption of the act[7] and its legislative history.[8]

3. Focusing on the "discharge . . . from commitment" language of the first sentence of § 17-7-131 (e) (5) (B), Sikes contends that the word "commitment" should be interpreted to include involuntary inpatient and outpatient treatment. Thus, he argues that, if a defendant successfully completes a conditional release plan, he must be discharged from any involuntary treatment plan, either inpatient or outpatient. This interpretation, however, facially contradicts the third sentence of subsection (e) (5) (B), which provides that "[t]he court may *require* the individual to participate in outpatient treatment or any other services or programs authorized by Chapter 3, 4, or 7 of Title 37." (Emphasis supplied.) By using the terms "require" and "outpatient treatment," the third sentence unequivocally permits the trial court to impose an involuntary outpatient plan on the defendant after he has successfully completed a conditional release program.

Sikes attempts to reconcile these two sentences by contending that the third sentence authorizes a trial court to refer a defendant to the oversight and control of a Regional Board pursuant to Chapter 2 of Title 37. This contention, however, only highlights the conflict

---

[3] *Sikes*, 221 Ga. App. at 598-599 (1).
[4] *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays*, 266 Ga. 393, 399 (3) (467 SE2d 875) (1996).
[5] *Ellis v. Johnson*, 263 Ga. 514, 515 (1) (435 SE2d 923) (1993).
[6] *Alford v. Public Svc. Comm.*, 262 Ga. 386, 387 (1) (418 SE2d 13) (1992).
[7] *Moore v. Robinson*, 206 Ga. 27, 40 (6) (55 SE2d 711) (1949).
[8] *Ga. Mental Health Institute v. Brady*, 263 Ga. 591, 592 (2) (a) (436 SE2d 219) (1993).

between the two sentences created by Sikes' interpretation of the word "commitment," as the third sentence expressly gives the trial court, not a Regional Board, the authority to require outpatient treatment, and expressly permits that outpatient treatment to be imposed under Chapter 3 of Title 37. The third sentence, in fact, does not mention Chapter 2 of Title 37. Further, the authority that Sikes contends the third sentence grants to the trial court actually exists under the *second* sentence of subsection (e) (5) (B), which provides that a trial court may refer defendants who have successfully completed a conditional release program "for community mental health, mental retardation, or substance abuse services as appropriate."

The interpretation that Sikes urges this Court to adopt places the first and second sentences of § 17-7-131 (e) (5) (B) in conflict with the third sentence, and renders the third sentence meaningless. As previously stated, courts should refrain from such interpretations. Further, we conclude that the statutory scheme of § 17-7-131, as well as the statutory history of the first and third sentences of subsection (e) (5) (B), demonstrates that the General Assembly intended for the word "commitment" in the first sentence of subsection (e) (5) (B) to refer to orders requiring involuntary inpatient treatment. Further, this interpretation reconciles the first, second, and third sentences of § 17-7-131 (e) (5) (B) and gives "sensible and intelligent effect" to each.[9]

4. We begin our examination of the statutory scheme with OCGA § 17-7-131 (d). It provides that when a defendant is found not guilty by reason of insanity, the trial court shall order the Department of Human Resources (DHR) to detain the defendant for a period not to exceed 30 days so that the DHR can conduct an evaluation of the defendant's mental condition and send a report thereof to the trial court. Section 17-7-131 (e) (1) then provides that if the report "indicates that the defendant does not meet the *inpatient commitment criteria of Chapter 3 of Title 37*,"[10] (emphasis supplied) the trial court may discharge the defendant without a further hearing. Because an inpatient is defined by Chapter 3 of Title 37 as being a person who, among other things, is "mentally ill . . . and who is in need of involuntary inpatient treatment,"[11] Section 17-7-131 (e) (1) thus equates commitment under its provisions with the involuntary inpatient requirements of Chapter 3 of Title 37.

Next, if the trial court does not discharge the defendant under

---

[9] *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays*, 266 Ga. at 399 (3).

[10] Although every time § 17-7-131 refers to Chapter 3 of Title 37 it also refers to Chapter 4 of Title 37, the relevant chapter of Title 37 for purposes of this opinion is Chapter 3. We therefore omit the reference to Chapter 4.

[11] OCGA § 37-3-1 (9.1).

the authority given to it by § 17-7-131 (e) (1), then § 17-7-131 (e) (2) requires the court to conduct a hearing "to determine if the defendant meets the *inpatient commitment criteria of Chapter 3 of Title 37*." (Emphasis supplied.) Thus, subsection (a) (2) also equates commitment with the involuntary inpatient requirements of Chapter 3 of Title 37.

Moreover, § 17-7-131 (e) (4) provides that if, following the hearing required by § 17-7-131 (e) (2), the trial court determines "that the defendant meets the *inpatient commitment criteria of Chapter 3 of Title 37*," the trial court "shall order the defendant to be *committed* to the Department of Human Resources to receive involuntary treatment under Chapter 3 of Title 37." (Emphasis supplied.) Thus, § 17-7-131 equates commitment with an order requiring the defendant to undergo involuntary inpatient treatment under Chapter 3 of Title 37.

Subsection (f) of § 17-7-131 also gives a clear indication that the word "commitment" in the statutory scheme of § 17-7-131 has been equated with orders for involuntary inpatient treatment. Subsection (f) provides that a defendant who "is *ordered committed*" to the DHR under subsection (e) of § 17-7-131 may petition the trial court for discharge "*from that commitment*," and that the trial court may deny the request only if the defendant meets the "*inpatient civil commitment criteria*." (Emphasis supplied.) Because subsection (f) provides that a defendant who "is ordered committed" to the DHR under subsection (e) should have his request for discharge determined by the "inpatient civil commitment criteria," subsection (f) excludes outpatient treatment from the concept of commitment in § 17-7-131, and instead equates commitment with orders for involuntary inpatient treatment under Chapter 3 of Title 37.

Further, this construction is consistent with the statutory scheme for treating defendants found not guilty by reason of insanity. Before a defendant is placed on a conditional release program, he has been involuntarily confined to an institution.[12] Thus, the conditional release operates to release the defendant from his institutional confinement and place him back in the community on a trial basis. As was stated in Sikes' petition for conditional release, a conditional release appears to serve the purpose of a release in the community on a trial basis to create a history by which the trial court and the mental health professionals can determine whether the defendant can live safely in the community and comply with a court-ordered treatment plan. Before permitting a conditional release, a trial court does not have to determine conclusively whether a defendant meets

---

[12] See OCGA § 17-7-131 (d), (e).

the requirements for involuntary outpatient treatment, but only whether he appears to meet those requirements.[13] If he does, the trial court has the flexibility to release the defendant in the community on a conditional basis. Significantly, however, during the period of conditional release, the defendant is still subject to the order of involuntary hospitalization, and may, if he does not comply with the terms of the conditional release, be involuntarily hospitalized pursuant to § 17-7-131 (e) (5) (C) (ii). Thus, if a defendant successfully completes his conditional release from his institutional confinement, the first sentence of § 17-7-131 (e) (5) (B) serves to unconditionally release him from the court order mandating his involuntary hospitalization.[14]

Interpreting "commitment" in the foregoing way gives meaning to both the first and third sentences of § 17-7-131 (e) (5) (B), resolves any conflict between the two, and makes them consistent and harmonious. Under this interpretation, if a defendant successfully completes his conditional release plan, the trial court must discharge him "from commitment," that is, from the order requiring his hospitalization. In contrast with Sikes' interpretation of the first sentence of § 17-7-131 (e) (5) (B), this interpretation permits the third sentence of that Code section to be given its plain meaning without creating a conflict with the first sentence. Under the plain meaning of the third sentence, the trial court may require the defendant to participate in outpatient treatment under Chapter 3 of Title 37. We emphasize, however, that the trial court may do so only if the defendant meets the requirements for outpatient treatment.[15]

---

[13] OCGA § 17-7-131 (e) (5) (A). In this regard, Sikes' petition for conditional release did not purport to contend that Sikes unconditionally met the requirements for involuntary outpatient treatment, nor did the trial court's order contain such a finding. Instead, Sikes' petition, prepared by the Georgia Mental Health Institute (GMHI), stated that the trial court had permitted Sikes to visit a personal care home for several short visits; that those visits "had gone very well"; and that therefore GMHI was requesting that Sikes be placed on conditional release of "six (6) months to determine Mr. Sikes' ability to live safely in the community."

[14] We emphasize, however, that, instead of petitioning for a conditional release from the hospitalization order under § 17-7-131 (e) (5) (A), a defendant always has the option to petition for his outright discharge from the order of involuntary hospitalization pursuant to the terms of § 17-7-131 (f). If the defendant carries his burden to show that he does not meet the requirements for involuntary inpatient treatment, the trial court must discharge him from the order of hospitalization.

[15] See OCGA § 37-3-1 (12.1). That Code section defines an "outpatient" as follows:
(12.1) "Outpatient" means a person who is mentally ill and:
(A) Who is not an inpatient but who, based on the person's treatment history or current mental status, will require outpatient treatment in order to avoid predictably and imminently becoming an inpatient;
(B) Who because of the person's current mental status, mental history, or nature of the person's mental illness is unable voluntarily to seek or comply with outpatient treatment; and
(C) Who is in need of involuntary treatment.

5. Moreover, this interpretation of "commitment" is consistent with the statutory history of § 17-7-131 (e) (5). As originally enacted in 1991,[16] subsection (e) (5) appeared in its present form except for two additions that were made in 1992 to subsection (e) (5) (B). The 1992 amendment added the words "from commitment" to the first sentence of § 17-7-131 (e) (5) (B) and added the current third sentence to § 17-7-131 (e) (5) (B).[17] Thus, as originally enacted, subsection (e) (5) (B) simply provided that if a defendant successfully completed a conditional release program, the trial court had to "discharge the individual at the end of that period."[18] Although the second sentence of (e) (5) (B) gave the trial court the right to refer the defendant to community health services, the trial court did not have the option of ordering outpatient treatment after the conditional release program.[19]

By adding the third sentence to § 17-7-131 (e) (5) (B) in 1992, the General Assembly signified its intent to grant trial courts authority over defendants that they previously did not have — the right to order involuntary outpatient treatment for defendants who successfully complete a conditional release program. Moreover, the caption to the amendment states that the General Assembly's intent in adopting the amendment was "to provide for outpatient treatment." Thus, the statutory history and the caption indicate that the General Assembly intended to give trial courts further control of a defendant after a conditional release program by providing that the court could order the defendant to participate in involuntary outpatient treatment under Chapter 3 of Title 37.

Further, given that § 17-7-131 (e) (5) (B) as originally enacted provided for the unlimited discharge of the defendant upon the successful completion of a conditional release program, and given that the General Assembly in 1992 added the third sentence to give the trial court further control of a defendant after the successful completion of such a program, the General Assembly had to curtail the unlimited discharge originally granted by the first sentence to avoid a conflict with the new third sentence. Because the General Assembly added the words "from commitment" to the first sentence, it must have intended for these words to eliminate that conflict. These words, however, would not accomplish that objective if "commitment" meant orders requiring either involuntary inpatient or outpatient treatment. Thus, the General Assembly could only have intended the word "commitment" to include orders requiring involun-

---

[16] Ga. L. 1991, pp. 780, 783.
[17] Ga. L. 1992, pp. 1328, 1330.
[18] Ga. L. 1991 at p. 783.
[19] Id.

tary inpatient treatment.

6. For the foregoing reasons, in the present case, if the trial court on remand determines that Sikes successfully completed his conditional release, the trial court must discharge Sikes from the order requiring his hospitalization. The trial court may, however, order Sikes to participate in involuntary outpatient treatment if the court determines that Sikes meets the requirements for such treatment. If the court determines that Sikes did not successfully complete his conditional release program, the court may take either of the actions authorized by § 17-7-131 (e) (5) (C) (i) or (ii).

*Judgment reversed and case remanded with direction. All the Justices concur.*

DECIDED MAY 12, 1997.

*Marcus & Cullen, Frances E. Cullen, Debra J. Blum, James C. Bonner, Jr.,* for appellant.

*David McDade, District Attorney, William H. McClain, Assistant District Attorney,* for appellee.

*Torin D. Togut, Lisa J. Krisher, Phyllis J. Holmen, Susan C. Jamieson,* amici curiae.